# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **PETER L. PEDERSEN,** | * | |
| **Plaintiff** | * | |
| v. | * | **CIVIL NO. JKB-15-1713** |
| **JEAN-FRANCOIS GESCHWIND,** *et al.*, | * | |
| **Defendants** | * | |

## MEMORANDUM

Professor Peter L. Pedersen ("Plaintiff") brought this action for correction of inventorship under 35 U.S.C. § 256, naming as defendants Dr. Jean-Francois Geschwind, The Johns Hopkins University School of Medicine ("JHUSOM"), and The Johns Hopkins University ("JHU") (collectively, "Defendants"). Now pending before the Court are Defendants' Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 23) and Plaintiff's Request for Leave of Court to File a Surreply (ECF No. 32). The issues have been briefed,[1] and no hearing is required, Local Rule 105.6 (D. Md. 2014). For the reasons explained below, Plaintiff's Request for Leave will be DENIED, and Defendants' Motion to Dismiss will be GRANTED.

---

[1] *See* ECF Nos. 23–1, 29–1, 31, 32, 33 & 36.

## I. Background[2]

This case concerns the inventorship of two patents directed toward the chemotherapeutic use of certain adenosine triphosphate ("ATP") inhibitors,[3] most notably a substance called 3-bromopyruvate ("3-BrPA"). U.S. Patent No. 7,547,673 ("the '673 patent") is directed to the treatment of liver cancer, while U.S. Patent No. 8,119,116 ("the '116 patent") is directed to the treatment of malignant tumors more generally.[4] The patents list three inventors: Plaintiff Pedersen, Defendant Geschwind, and one Young Hee Ko, a nonparty.[5] JHUSOM owns both patents by assignment from the inventors, though JHU is nominal assignee of the '673 patent. (ECF No. 12 ¶¶ 12-13.)

---

[2] Ordinarily, on a motion to dismiss, the Court restricts its analysis to the facts as alleged by the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). However, where, as here, the defendant moves to dismiss on the grounds that the Court lacks subject matter jurisdiction, the Court may consider evidence outside the pleadings without thereby converting the motion to one for summary judgment. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).

[3] Adenosine triphosphate ("ATP") is a "high-energy molecule that stores the energy we need to do just about everything we do." Biologists consider it "the energy currency of life." *Adenosine Triphosphate*, Ga. State Univ., http://hyperphysics.phy-astr.gsu.edu/hbase/biology/atp.html (last visited Oct. 20, 2015). According to the patents at issue in this case, highly malignant tumors "metabolize glucose at high rates to synthesize high levels of ATP." (ECF No. 12–3 at 11.) The patents describe treatment techniques that inhibit ATP production—thereby slowing (and potentially even reversing) tumor growth.

[4] Specifically, U.S. Patent No. 7,547,673 ("the '673 patent") claims methods of treating liver cancer through transcatheter hepatic intra-arterial injection of certain chemical compounds, including 3-bromopyruvate ("3-BrPA"). (ECF No. 12–3 at 27.) U.S. Patent No. 8,119,116 ("the '116 patent") claims methods of treating cancerous tumors more generally through 3-BrPA and secondary agents administered via proximal catherization. (ECF No. 12–4 at 27.)

To be clear, the patents protect particular treatment *methods*—not the chemical substances in and of themselves, nor even the use of the substances as anticancer agents. In fact, officials at The Johns Hopkins University ("JHU") had initially attempted to secure protection for, *inter alia*, a "method of treating cancer in a subject comprising administering to the subject an effective amount of [certain compounds, including 3-BrPA]." *Pre-Grant Publications*, Pat. Application Info. Retrieval, http://portal.uspto.gov/pair/PublicPair (accessed by searching for Application No. 10/243,550) (last visited Oct. 27, 2015). However, the United States Patent and Trademark Office ("USPTO") *rejected* these claims as disclosed in the prior art. (ECF No. 31–1 at 10-11.) It was only after JHU amended the claims to focus on the unexpectedly efficacious intra-arterial injection of these substances that the USPTO found the claims novel and free of prior art. (ECF Nos. 31 at 10, 31–2 at 6.)

[5] Plaintiff and Ko have a lengthy professional history: Ko joined Plaintiff's laboratory in 1991 (ECF No. 12 ¶ 17), and the two worked together until Ko's resignation from JHU in 2006. The two also appear to have had some sort of domestic arrangement: Ko acknowledged in a 2006 deposition that she sometimes stayed overnight at Plaintiff's house and that she co-owned a vehicle with Plaintiff. (ECF No. 23–3 at 7-8.)

Though Ko is not a party to this litigation, she indicated in a June 9, 2015, letter—appended to Plaintiff's Complaint—that she is "aware of, and agree[s] with, the relief sought in this action," and she further stated that she would be "bound by any decision rendered in this action on the merits." (ECF No. 12–2 at 2.)

Plaintiff alleges that "Ko was the sole inventor of the subject matter of the invention" (*id.* ¶ 40) and that, consequently, Ko alone should receive credit for the '673 and '116 patents.

Plaintiff is a professor in the JHUSOM Department of Biological Chemistry. According to Plaintiff, Geschwind (a former member of the JHUSOM Department of Radiology) approached Plaintiff in July 1999 to discuss the possibility of delivering chemotherapeutic agents via an arterial delivery system. (*Id.* ¶ 18.) Thereafter, Plaintiff, Geschwind, and Ko formed a "translational research team" with the goal of "translating findings from basic laboratory research into use in clinical medicine." (*Id.* ¶ 19.) Ko, the "investigator who would lead the search for the best therapeutic agent for liver cancer," determined that 3-BrPA would be an especially potent inhibitor of tumor growth (*id.*), and she conducted a series of experiments with laboratory animals, the success of which reinforced her theory. (*Id.* ¶ 21.) Plaintiff contends that Geschwind's sole contribution during this experimentation phase was to "guide the catheter into the hepatic arter[ies]" of laboratory animals and "push the plunger." (*Id.* ¶ 23.)

In 2001, Ko published an article in *Cancer Letters* describing the results of the 3-BrPA study: Plaintiff and Geschwind were listed as coauthors. (*Id.* ¶¶ 25-27.)[6] One year later, Plaintiff and Ko published a related article in *Cancer Research*: they allowed Geschwind to appear on the byline as the first-named author, ostensibly at his request. (*Id.* ¶ 31.) Around this time, Geschwind allegedly began taking public credit for the discovery of 3-BrPA's chemotherapeutic properties. (*Id.* ¶¶ 31-32.)

In August 2001, Plaintiff began the "process of seeking patent protection for Ko's discovery" by executing an "invention disclosure" (*id.* ¶ 29), an internal JHUSOM document used to notify the JHUSOM Office of Technology Licensing ("OTL") about a possible

---

[6] Plaintiff avers that he was properly credited as a coauthor in view of his editorial contributions. (ECF No. 12 ¶ 26.) By contrast, he claims that he encouraged Ko to include Geschwind as a professional courtesy. (*Id.* ¶ 27.)

3

invention.[7] The OTL relies on the information in these disclosure forms in determining whether to pursue patent protection and/or commercialization. (ECF No. 12–6 at 2.) On the disclosure form, Plaintiff identified Ko as "lead inventor" of an invention he described as "3-Bromopyruvic Acid as a Potent Anticancer Agent Delivered Intraarterially"; he identified Geschwind and himself as "additional inventors." (*Id.* at 2-3.) Notably, all three translational team members signed the form. However, Plaintiff now claims that he mistakenly included Geschwind and himself because he was "not familiar with the difference between inventorship of a patent and authorship of an article." (ECF No. 12 ¶ 29.) According to Plaintiff, Geschwind could not be considered an inventor because he conducted no hands-on benchside experiments and did not even know what 3-BrPA was before Ko educated him. (*Id.* ¶ 41.)[8]

Plaintiff alleges that the purportedly erroneous invention disclosure was submitted as part of a provisional patent application in fall of 2001. (*Id.* ¶ 32.) That application eventually ripened into the '673 patent (issued in June 2009) and the '116 patent (issued in February 2012). (*Id.*) On June 11, 2015, Plaintiff filed this action under 35 U.S.C. § 256, seeking (1) a declaration that

---

[7] JHU, like most research institutions, maintains an Intellectual Property Policy ("IP Policy") granting it the "right to obtain title to Intellectual Property developed as a result of support either directly from or channeled through the University." (ECF No. 12–7 at 4.) Faculty members are required to disclose the creation of any IP and cooperate with the university in defending and prosecuting patents. (*Id.*) Revenues derived from patent licensing agreements are shared: as relevant here, for the first $300,000 of annual net revenue, an inventor is entitled to a personal share of 35% and a lab share of 15%; the inventor's department takes 15%; the inventor's school takes 30%; and the university takes 5%. (*Id.* at 5.)

[8] To support his proposition, Plaintiff points to a series of statements that Geschwind made in a 2006 deposition. For instance, Geschwind noted that the chemistry of 3-BrPA was "not [his] expertise," and he admitted that he did not "recall ever creating a solution of [3-BrPA]." (ECF No. 12–9 at 8, 11.)

The 2006 deposition related to an employment discrimination suit filed in this District by Ko against JHU and several of its employees, including Geschwind. Ko's suit did not include a section 256 correction-of-inventorship claim, although in her lengthy complaint she foreshadowed several of the allegations presented here, most notably that Geschwind's research training was "inadequate to allow him to contribute anything to [the research] effort other than the actual delivery of the chosen compound" (ECF No. 23–4 at 11) and that Plaintiff and Geschwind had "little or no role in the discovery of the . . . anti-cancer properties of 3-BrPA" (*id.* at 14).

Judge Quarles dismissed most of Ko's claims, *see Ko v. The Johns Hopkins Univ.*, Civ. No. WDQ-05-1475 (Jan. 4, 2006) (ECF No. 47), and the parties subsequently settled. As a condition of settlement, Ko executed a broad release and covenant not to sue, which covered not only those claims raised in her discrimination suit but also any other then-existing claims against any of the named defendants, with narrow exceptions. (ECF No. 23–2 at 3-4.)

Perhaps Ko herself could assert Article III standing to bring a section 256 claim today, but perhaps any such suit would be barred by the prior release and covenant not to sue.

Ko is the sole inventor of both patents and (2) an order directing the United States Patent and Trademark Office ("USPTO") to issue a Certificate of Correction accordingly.

Those are the underlying facts. But the questions before the Court at this stage have little to do with scientific discovery or patent administration. Instead, they concern justiciability and the anomalous interests of a party who seeks to rid himself (and another) of what ordinarily are pecuniary and professional benefits associated with recognized inventorship.

Defendants filed a Motion to Dismiss on July 20, 2015. (ECF No. 23.) Plaintiff filed a response in opposition on August 24, 2015 (ECF No. 29), and Defendants replied on September 11, 2015 (ECF No. 31).

## II. *Plaintiff's Request for Leave to File a Surreply*

Before considering the substance of Defendants' pending Motion to Dismiss, the Court must address an ancillary procedural matter. On September 21, 2015, Plaintiff filed a Request for Leave of Court to File a Surreply. (ECF No. 32.) Defendants opposed Plaintiff's request (ECF No. 33), and Plaintiff submitted a memorandum in reply (ECF No. 36).

"Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." Local Rule 105.2(a) (D. Md. 2014). Though disfavored, surreplies "may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (per curiam).

Plaintiff wishes to present two arguments in his surreply. First, he disputes Defendants' assertion in their reply memorandum that Geschwind should qualify as a joint inventor of the '673 and '116 patents as a matter of black-letter patent law. (ECF No. 32–1 at 4.) But that issue is immaterial to the pending Motion to Dismiss, which concerns Plaintiff's standing to bring a

5

section 256 action in the first instance. Moreover, Defendants' comments on inventorship law are responsive to allegations from the Complaint that Plaintiff rehashed in the opening pages of his opposition memorandum. Had Plaintiff wished to include additional case law or analysis, he could have done so there.

Second, Plaintiff assails a minor point raised in Defendants' reply memorandum concerning Plaintiff's hypothetical liability to the National Institutes of Health ("NIH").[9] But here again, Defendants' contention was responsive to an issue raised in Plaintiff's Complaint and discussed throughout the briefs—namely, to what extent (if any) might Plaintiff face sanctions for his allegedly false statement on the JHUSOM invention disclosure?

Plaintiff has not demonstrated that any aspect of Defendants' reply memorandum falls outside the scope of argument framed by the earlier papers. Consequently, Plaintiff's Request for Leave to File a Surreply will be denied.[10]

### *III. Standard for a Motion to Dismiss for Lack of Subject Matter Jurisdiction*

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), the Supreme Court confirmed the three elements that comprise the "irreducible constitutional minimum of standing": (1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and that will (3) likely be redressed by a favorable decision. The party invoking federal jurisdiction—typically, the plaintiff—bears the burden of establishing these elements. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's

---

[9] Specifically, Defendants posit that the National Institutes of Health ("NIH") funds "substantive research, not patent prosecution," and that it is therefore improbable that the NIH would have any interest in Plaintiff's allegedly false invention disclosure. (ECF No. 31 at 16.) Plaintiff counters that NIH grants can apply to overhead costs, including those associated with patent prosecution. (ECF No. 32–1 at 4-5.) But the relevant question, as discussed in Part IV.B.4, *infra*, is not whether an NIH grant supported the prosecution here; it is whether the NIH or some other governmental entity is likely to impose a sanction on Plaintiff.

[10] Lest there be any doubt: even had the Court allowed Plaintiff to file his superfluous surreply, the Court would still have granted Defendants' Motion to Dismiss. The arguments presented in the surreply and related briefing are neither dispositive nor even particularly helpful at this stage.

case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

"When a defendant raises standing as the basis for a motion under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction . . . the district court 'may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). When ruling on a 12(b)(1) motion, the court accepts the plaintiff's "well-pleaded allegations as true and construe[s] the complaint in favor of the plaintiff." *Finnin v. Bd. of Cnty. Commr's*, 498 F. Supp. 2d 772, 777 (D. Md. 2007) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). However, the burden remains on the plaintiff to prove that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

## IV. Analysis

Section 256, Title 35, United States Code, is a savings statute, a mechanism for avoiding patent invalidity in case of misjoinder or nonjoinder of inventors.[11] The statute contemplates two avenues for correction of inventorship: First, if all parties and their assignees are in agreement, and if the factual proof is sufficient, the Director of the USPTO may issue a certificate correcting an inventorship error. § 256(a). Second, in the absence of agreement, a court may—on notice and hearing of all parties concerned—order the Director to issue such a certificate. § 256(b).

---

[11] Section 256 prevents the harsh result that might otherwise obtain in case of misjoinder or nonjoinder: "naming of the correct inventor or inventors [is] a condition of patentability; failure to name them renders a patent invalid." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998) (citing former section 102(f), which was repealed by the Leahy-Smith America Invents Act but which would still govern the patents at issue here, *see* Pub. L. No. 112-29, § 3(n)(1), 125 Stat. 284, 293 (2011)).

The United States Court of Appeals for the Federal Circuit[12] has recognized that, while a "concerned" party falls within "the purview of the statute," such a party "must meet constitutional standing requirements in order to invoke it." *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1357 (Fed. Cir. 2001); *see also Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009) ("*Chou* . . . teaches that a plaintiff seeking correction of inventorship under § 256 can pursue that claim in federal court only if the requirements for constitutional standing—namely injury, causation, and redressability—are satisfied.").

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendants here move to dismiss on the ground that Plaintiff has not adequately alleged Article III standing and that this Court consequently lacks subject matter jurisdiction over the action. Pursuant to Rule 12(b)(6), Defendants further contend that it is Ko, rather than Plaintiff, who is the real party in interest and that Plaintiff has thus failed to state a claim upon which relief can be granted. Because the Court agrees that Plaintiff lacks standing to assert a section 256 claim, it does not separately consider whether Plaintiff is the proper party to bring this action.

### A. *Article III Standing*

The Article III case-or-controversy doctrines establish "fundamental limits on federal judicial power in our system of government." *Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). Among these doctrines, none is more basic—or more essential—than the requirement that a plaintiff must have standing to proceed in federal court. Specifically, the

---

[12] This Court looks to Federal Circuit precedent in conducting its patent-law analysis. *See MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1570 (Fed. Cir. 1989) (finding that United States district courts may hear actions brought pursuant to section 256 and that such actions "aris[e] under" the patent laws so as to confer jurisdiction on the Federal Circuit), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992); *see also Induction Innovations, Inc. v. Pacholok*, No. 13 CV 5102, 2014 WL 4922350, at *8 n.14 (N.D. Ill. Sept. 30, 2014) (explaining that patent inventorship—like patent infringement—is a unique question of patent law and that district courts therefore look to Federal Circuit precedent in resolving section 256 disputes).

8

plaintiff must show an "injury in fact," *i.e.*, an "invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The plaintiff must also demonstrate a "causal connection between the injury and the conduct complained of," *i.e.*, the injury must be fairly traceable to the challenged action and not attributable to some independent action of a nonparty. *Id.* Finally, it must be "likely"—as opposed to merely "speculative"—that the "injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).

Over the years, the Supreme Court has routinely rejected suits in which the harm alleged is too speculative or generalized. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013) (finding standing requirements unsatisfied where an "attenuated chain of inferences" was necessary to reach the harm that plaintiffs complained of); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) (recognizing that although a litigant may derive pleasure from the fact that the "Treasury is not cheated," a "wrongdoer gets his just deserts," or "the Nation's laws are faithfully enforced," such "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury").

Because the rules of standing are "threshold determinations of the propriety of judicial intervention," it is the plaintiff's responsibility "clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518 (1975). Here, as will be seen, Plaintiff has failed to allege such facts: though he proffers various interests allegedly tied to the patents' fate, he has not identified a cognizable injury redressable by the section 256 relief that he seeks.

### B. Plaintiff's Purported Interests

#### 1. "Named Inventor" Interest

In his Complaint, Plaintiff first alleges that "[a]s a named inventor on the Patents, [he] has an interest in correcting the inventorship of the Patents so that they reflect the proper inventor." (ECF No. 12 ¶ 32.) Plaintiff evidently equates this "named inventor" interest with the public's interest in "assuring correct inventorship designations on patents." (*Id.*) Of course, as Defendants observe, Article III bars private litigants who lack a concrete, particularized injury from suing to vindicate the public interest. *Lujan*, 504 U.S. at 576. And Plaintiff's status as a named inventor—a "mark of success in [his] field," *Chou*, 254 F.3d at 1359—plainly does not constitute a concrete and particularized injury to him.[13]

In his opposition memorandum, Plaintiff posits that he "seeks to enforce his right not to have his name used in a public way to promote the commercial activities of another" (the "other" being assignee JHUSOM and its licensees). (ECF No. 29–1 at 9.) It is not clear whether Plaintiff intends this argument as a defense of his "named inventor" interest, but in any event the argument is unavailing. Plaintiff nowhere alleges that JHU's Intellectual Property Policy ("IP Policy") is unlawful or that the assignment was somehow defective: on the contrary, by executing a JHUSOM invention disclosure, Plaintiff signaled that he understood and assented to the IP Policy. Plaintiff cannot seriously contend that he has standing to sue in federal court simply because he is unhappy with the manner in which a bona fide assignee of a patent chooses to deploy or license its interest. Such a theory would confer near-limitless standing on disaffected scientists, well beyond the bounds of the particularized injury that Article III mandates.

Plaintiff's "named inventor" theory does not support his claim for standing.

---

[13] Plaintiff separately argues that this allegedly unjustified status compromises his academic reputation. The Court addresses that argument in Part IV.B.5, *infra*.

## 2. *Financial Interests*

Plaintiff next identifies two financial interests that he believes are sufficient to establish his standing. First, he claims a direct financial interest stemming from his personal share of any net revenue that the patents generate. (ECF No. 12 ¶ 33.) Second, he claims an indirect financial interest through his laboratory and/or his department. (*Id.* ¶ 34.)

In *Chou*, the Federal Circuit recognized that a plaintiff need not prove an ownership stake in a patent in order to pursue a section 256 claim; a concrete financial interest, such as royalty or revenue-sharing rights, is good enough. 254 F.3d at 1359. But merely identifying a legally protected interest does not end the justiciability inquiry; rather, Plaintiff must identify an actual or imminent *injury* to that interest. Dr. Chou alleged that she had been wrongfully omitted from certain patents; she further averred that, as a named inventor, she should have been entitled to 25% of gross royalties and up-front licensing payments as well as a 25% equitable stake in any new companies that formed around her inventions. *Id.* If, the Federal Circuit reasoned, Dr. Chou had indeed been deprived of those financial interests, "then she [would] have suffered an injury-in-fact, *i.e.*, the loss of those benefits." *Id.*

Here, by contrast, Plaintiff *presently* enjoys a financial interest equal to one-third of the 35% "inventors' personal share" under the IP Policy (ECF No. 12–7 at 5)—or approximately 11.67% of net revenue. But if the Court were to grant the "relief" that Plaintiff seeks and order his name (and Geschwind's) removed from the patents, Plaintiff would thereafter be entitled to a 0% share. Plaintiff has thus not *alleged* an actual or imminent financial injury; he has instead *requested* one.

Plaintiff's indirect financial theory fares no better. In his Complaint, Plaintiff suggests that the shares presently allocable to his laboratory and to the Department of Biological

Chemistry are diluted by shares allocable to Geschwind's former department, the Department of Radiology. (ECF No. 12 ¶ 34.) With respect to Plaintiff's lab, his allegation makes little sense: if the Court were to order Plaintiff's name removed from the patents, his lab share—presently valued at one-third of 15%, or 5%—would be reduced to zero.

As for the Department of Biological Chemistry, the math is slightly more complicated. Under the IP Policy, departments are entitled to a 15% share; assuming that Ko would be treated as a member of the Department of Biological Chemistry for purposes of revenue distribution,[14] that department presently enjoys a 10% stake. If Plaintiff and Geschwind were removed from the patents, their lab and department shares would be reallocated to Ko—but Ko is no longer employed by JHU. Per the IP Policy, Ko's reallocated 15% lab share would be further redistributed among her former department and school as well as JHU itself, with the department receiving 30% of that redistribution. (ECF No. 12–7 at 6.) In the end, the Department of Biological Chemistry would receive the full 15% department share (up from 10%) plus a 4.5% redistributed lab share, two-thirds of which can be traced back to Plaintiff and Geschwind. While these adjustments would enhance the position of Plaintiff's department, they would work a greater detriment on Plaintiff, as he would forfeit his 11.67% personal share *and* his 5% lab share. Put simply, Plaintiff stands to lose more than his department could possibly gain.[15]

---

[14] This is, in fact, a disputed point: while Plaintiff attested that Ko was solely appointed to the Department of Biological Chemistry at both the time of the invention (in 2000) and the time of her resignation (in 2006) (ECF No. 29–2 at 2-3), Defendants counter that Ko's previous employment discrimination lawsuit stemmed from the nonrenewal of her appointment to the Department of *Radiology* (ECF No. 31 at 21-22).

If Defendants are correct, then the effect of Plaintiff's suit would be to strip the Department of Biological Chemistry of what little interest it has in the patents. Fortunately, the Court need not delve any further into this particular dispute: even assuming that Ko was a member of the Department of Biological Chemistry, Plaintiff cannot satisfy Article III's standing requirements on the basis of his alleged financial interests.

[15] Further, it is not clear *how* Plaintiff would benefit from an increased department share. To the extent that the department allocates funding for research activities, Plaintiff is far better off in the status quo (where his lab is entitled to a stable 5% of revenues) than in a scenario in which he must vie for funds alongside potentially dozens of other faculty members and research fellows. Conversely, to the extent that Plaintiff would assert a more general interest in the financial welfare of his department, there is no indication (in the Complaint or elsewhere) that Plaintiff represents the department in any official capacity—and the doctrine of third-party standing generally bars

Article III courts exist to remedy injuries, not to inflict them. Plaintiff's convoluted financial theories cannot support this claim for standing.

### 3. *Competitor Interest*

Plaintiff's next theory of standing is particularly strained. He alleges that "Geschwind's notoriety and misleading claims have . . . resulted in funds being directed toward [Geschwind]." (ECF No. 12 ¶ 35.) For instance, Plaintiff asserts that JHU provided Geschwind's research company with an exclusive license to commercially exploit the patents, creating a "substantial likelihood that such commercial exploitation will come at the expense of [Plaintiff] and his laboratory." (*Id.*)[16] Plaintiff further surmises that this licensing agreement *must* have come about because of Geschwind's "false claim to be a co-inventor." (*Id.*) Plaintiff additionally hypothesizes that Geschwind, who recently accepted a position at the Yale School of Medicine, may siphon off grant money that might otherwise be available for JHUSOM and Plaintiff's lab.

Plaintiff's competitor theory is nothing more than a string of conclusions, untethered to any firm factual claims. Plaintiff *speculates* that Geschwind's recent success can be attributed to his association with the patents; Plaintiff then *conjectures* that Geschwind may, at some indefinite future time, apply for and secure funding that might have otherwise *hypothetically* inured to Plaintiff's benefit. The Supreme Court has firmly rejected this kind of speculative, "what if" pleading. *See Clapper*, 133 S. Ct. at 1143 (rejecting a theory of future injury as "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending'"). Moreover, even if Plaintiff could identify particular pending grants for which

---

private litigants from asserting interests other than their own. *See Singleton v. Wulff*, 428 U.S. 106, 113 (1976) ("Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation.").

[16] In an effort to explain how this hypothetical commercial exploitation may harm his lab, Plaintiff adds yet another layer of speculation: he proposes that Geschwind's exclusive license could "inhibit" the ability of Plaintiff's lab to "continue further research on the Patents' subject matter or to obtain further patents or license further discoveries." (ECF No. 29–1 at 17.) Plaintiff's inferential acrobatics are breathtaking in scope.

both he and Geschwind are in contention, it is unlikely that any disadvantage to Plaintiff's competitive position would give rise to an Article III injury. *Cf. Hardin v. Ky. Utils. Co.*, 390 U.S. 1, 5-6 (1968) ("[E]conomic injury which results from lawful competition cannot, in and of itself, confer standing on the injured [party] to question the legality of any aspect of [a] competitor's operations.").[17]

The Court will not (indeed, cannot) allow Plaintiff to speculate his way into standing.[18] His competitor interest is of no help to him here.

### 4. *Liability Interest*

Aside from his purported "named inventor," financial, and competitor interests, Plaintiff believes he has an "interest in correcting the inventorship designations on the Patents because the [USPTO] relied on a declaration signed by [Plaintiff]" improperly naming Ko, Geschwind, and himself as inventors. (ECF No. 12 ¶ 36.) Relatedly, Plaintiff posits that he was the "principal investigator"[19] responsible for ensuring compliance with NIH grant regulations and JHU policies. (*Id.* ¶ 37.) Plaintiff adds that JHUSOM faculty are bound by strict ethical guidelines outlined in the so-called "Gold Book," and he fears he may have breached those rigorous standards through his erroneous invention disclosure. (*Id.* ¶ 38.)

As for the Gold Book, Plaintiff's fears are groundless. Both JHU and JHUSOM are named Defendants here. They have made clear that they do not intend to discipline Plaintiff; on

---

[17] It is also hopelessly unclear how Plaintiff is unfairly disadvantaged in the hypothetical he has constructed. To whatever extent Geschwind has benefited from his association with the patents, Plaintiff shares that *same* association. Assuming Geschwind has better leveraged his reputation as an inventor, that is hardly grounds for a lawsuit.

[18] Plaintiff's competitor theory is not merely problematic; it is dangerously expansive. Any disgruntled inventor could wield section 256, supposedly a savings mechanism, as instead a saber—claiming that a competitor in the field has gained an unfair advantage through an improper patent designation. This is surely not the kind of litigation Congress contemplated when it enacted section 256 with the express recognition that where "two or three people make an invention together" they must "apply as joint inventors . . . at their peril," and where Congress thus crafted the statute to "permit[] a bona fide mistake . . . to be corrected." S. Rep. No. 82-1979 (1952).

[19] Plaintiff cites 45 C.F.R. § 75.2, which provides that a principal investigator is "responsible and accountable to officials of the recipient organization for the proper conduct of [a grant-supported] project." Section 75.2 says nothing about a principal investigator's putative liability.

14

the contrary, they "believe[] the inventorship listed on the Patents is correct." (ECF No. 23–1 at 20.) Further, Plaintiff admits that he brought the inventorship discrepancy to the attention of certain officials in JHU's Technology Transfer Office back in 2009 (ECF No. 29–2 at 3); the fact that JHU took no responsive action reinforces the Court's conclusion that any academic sanction is vanishingly improbable and unduly speculative.

As for the USPTO and the NIH, Plaintiff has failed to identify a single statute or regulation that would authorize these agencies to take adverse action against him. Through its own research, the Court discovered that *willful* false statements on an inventor's oath or declaration, 35 U.SC. § 115, can trigger criminal penalties;[20] likewise, *knowingly* false or fraudulent claims for federal grant monies can trigger liability under the Civil False Claims Act, 31 U.S.C. § 3729, and/or the Criminal False Claims Act, 18 U.S.C. § 287. But Plaintiff himself characterizes his mistake as unintentional, *i.e.*, not willful or knowing. And in any event, even if Plaintiff did make an actionably false statement, the Court is powerless to expunge that mistake: altering the inventorship of a patent in 2015 will not abrogate a false statement made in 2001.

Plaintiff's unanchored qualms about the possible consequences he might face for an erroneous statement he made almost fifteen years ago do not give him standing to bring a section 256 claim.

### 5. *Reputational Interest*

Finally, Plaintiff raises a pure reputational interest: he asserts that his status as a "fair and honest academician is and will be adversely affected by the inclusion of himself and Geschwind as co-inventors." (ECF No. 12 ¶ 39.) In his opposition memorandum, Plaintiff attempts to pad

---

[20] Presumably Plaintiff and his named coinventors executed such an oath or declaration at some point in the patent prosecution process. Plaintiff does not specifically reference the oath in his Complaint, although in his opposition memorandum he seems to distinguish between the JHU invention disclosure that he prepared and a subsequent declaration that he made to the United States Patent and Trademark Office. (ECF No. 29–1 at 22-23.)

15

this naked allegation by asserting that the harm is "particularly acute with regard to [Plaintiff's] potential colleagues—young researchers who are trying to determine which lab they should join and who are particularly attuned to a potential supervisor's reputation for accurately attributing discoveries made by subordinate researchers in his laboratory." (ECF No. 29–1 at 24.) These "young researchers," so the thinking goes, will hesitate to work for a boss with a penchant for taking credit where credit is not due.

Assuming that Plaintiff's misgivings about the state of his academic reputation are genuine, the question remains: is this the kind of injury cognizable in an Article III court? Several other courts have opined that reputational injuries *may* support standing to bring a section 256 claim, and in a very recent opinion the Federal Circuit embraced this view. *See Shukh v. Seagate Tech., LLC*, No. 2014-1406, 2015 WL 5752374, at *3 (Fed. Cir. Oct. 2, 2015) ("Today, we hold that concrete and particularized reputational injury can give rise to Article III standing."). But the analysis in *Shukh* and related cases belies Plaintiff's notion that his purported reputational injury is cognizable. Dr. Shukh alleged that he was wrongfully omitted as an inventor on six patents and four pending applications; the Federal Circuit observed that "being considered an inventor of important subject matter is a mark of success in one's field" and that "[p]ecuniary consequences may well flow from being designated as an inventor." *Id.* (alteration in original) (quoting *Chou*, 254 F.3d at 1359). The court added that "if the claimed inventor can show that being named as an inventor on a patent would affect his employment, the alleged reputational injury likely has an economic component sufficient to demonstrate Article III standing." *Id.*

Cases predating *Shukh* placed similar emphasis on the advantages associated with named inventorship. *Compare Czarnik v. Illumina, Inc.*, 437 F. Supp. 2d 252, 256-57 (D. Del. 2006)

(standing was satisfied where plaintiff alleged that his omission from patents harmed his reputation in the scientific community, deprived him of prestige, and impacted his ability to secure a lucrative position at a start-up company), *with Barnette v. Dicello*, 616 F. Supp. 2d 709, 714 (N.D. Ohio 2007) (standing was unsatisfied where plaintiff failed to show how patent designation would constitute a mark of success in his field). Even *Krauser v. Evollution IP Holdings, Inc.*, 975 F. Supp. 2d 1247 (S.D. Fla. 2013), which arguably adopts a more expansive theory of the reputation interest, concerned the rights of an inventor who claimed to have been omitted from certain patents. Dr. Krauser alleged that recognition for his contributions to each invention would bolster his stature in his field, and he claimed a general economic interest (albeit not ownership rights or a specified entitlement to any particular streams of revenue).[21]

At bottom, the reputational interest recognized by a handful of courts and now sanctioned by the Federal Circuit is an interest in the benefits that flow from inventorship: public recognition; vocational leverage; pecuniary gain. These benefits are concrete and fairly traceable to named inventorship on a patent; deprivation of such named inventorship is therefore an injury that courts can redress through the relief prescribed in section 256. By contrast, Plaintiff's allegations about his academic reputation are conclusory and speculative. He supposes that his reputation "is and will be adversely affected by the inclusion of himself and Geschwind as co-inventors" (ECF No. 12 ¶ 39), yet he proffers no factual content to support this supposition. He does not identify a single instance in which he has been criticized, ostracized, or deprived of any opportunity whatsoever because of his error; he points to no actual financial loss, no

---

[21] Plaintiff correctly notes that, in embracing the reputational-interest theory of standing, *Krauser* analogized to defamation law, which, of course, serves to vindicate reputational harms. But the *Krauser* court, like every other court that has taken up the question, was concerned with protecting the rights of "*true* inventor[s] of a product" who may lack any economic or ownership interest in that product. 975 F. Supp. 2d 1247, 1261 (S.D. Fla. 2013). *Krauser* did not contemplate, and should not be read to suggest, that a *noninventor* might obtain standing by virtue of his *inclusion* on a patent.

17

forfeited teaching or research opportunities, nor even an uncomfortable conversation with a colleague. Plaintiff's fears about "young researchers" avoiding employment in his lab are similarly conjectural: he does not identify a single instance in which a would-be colleague has declined or even hesitated to work with him because of the inventorship discrepancy.[22]

Far from the "concrete and particularized reputational injury" that *Shukh* recognized as a possible conduit to Article III standing, 2015 WL 5752374, at *3, Plaintiff's allegations are an exercise in guesswork: he fails to invoke the Court's subject matter jurisdiction for the simple reason that he has pleaded no injury the likes of which the Court can redress. As Gertrude Stein might have put it, "there is no *there* there."

Patent law is fundamentally about "promot[ing] the Progress of Science and useful Arts"[23] by rewarding people for their creations. Plaintiff's theory here would turn that law on its head, redefining a patent not as a badge of professional and intellectual honor but as an albatross around the neck. Without any indication that the Federal Circuit intended *Shukh* to sweep so broadly, the Court holds that Plaintiff has failed to allege an injury redressable through the section 256 relief that he seeks.[24]

---

[22] The Court also notes that Plaintiff makes no reference to these "young researchers" in his Complaint; he presents these allegations for the first time in his memorandum of law. Although the Court is obliged at this stage to take Plaintiff's well-pleaded allegations as true, *Finnin v. Bd. of Cnty. Commr's*, 498 F. Supp. 2d 772, 777 (D. Md. 2007), it need not accord the same weight to statements in the briefs.

[23] U.S. Const., art. I, § 8, cl. 8.

[24] The Court acknowledges that, of all the theories Plaintiff has advanced—several of which seem farfetched, even fanciful—Plaintiff's reputational-interest theory brings him closest to a justiciable case or controversy. But if ever there were a case in which the Court might be justified in recognizing a novel approach to standing (one never sanctioned by the U.S. Supreme Court, the Federal Circuit, or, indeed, any district court that this Court is aware of), *this is not that case*. This case, where a strawman plaintiff stands in for a nonparty to whom the primary benefits of relief would run; this case, where the parties (and that nonparty) have years of bad blood between them; this case, where the plaintiff's cause of action boils down to a clerical mistake he allegedly made almost fifteen years ago; *this is not the case* to turn *Shukh* on its head and reimagine what it means for a section 256 litigant to claim reputational harm.

*V. Conclusion*

For the foregoing reasons, an Order shall enter DENYING Plaintiff's Request for Leave of Court to File a Surreply (ECF No. 32) and GRANTING Defendants' Motion to Dismiss (ECF No. 23).

DATED this 27th day of October, 2015.

BY THE COURT:

/s/
James K. Bredar
United States District Judge